**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL VENTURE CAPITAL
ASSOCIATION,
  25 Massachusetts Ave NW, Suite 730
  Washington, DC 20001

ATMA KRISHNA,
  18th Floor, Tower A, Building No. 5
  DLF Cyber City,
  Gurgaon 122002, Haryana, India

ANAND KRISHNA,
  18th Floor, Tower A, Building No. 5
  DLF Cyber City,
  Gurgaon 122002, Haryana, India

OMNI LABS, INC.,
  1161 Mission St.
  San Francisco, CA 94103

*and*

PEAK LABS LLC d/b/a OCCASION,
  541 N Fairbanks, 22nd Floor
  Chicago, IL 60611,

        *Plaintiffs*,

     v.

ELAINE DUKE, in her official capacity as
Acting Secretary of Homeland Security,
  c/o Office of the General Counsel
  U.S. Department of Homeland Security
  245 Murray Lane, SW
  Mail Stop 0485
  Washington, DC 20528-0485

U.S. DEPARTMENT OF HOMELAND
SECURITY,
  c/o Office of the General Counsel
  U.S. Department of Homeland Security
  245 Murray Lane, SW
  Mail Stop 0485

Civil Action No.: 17-1912

**COMPLAINT**

Washington, DC 20528-0485

JAMES MCCAMENT, in his official capacity
as Acting Director of U.S. Citizenship and
Immigration Services,
   c/o Office of the General Counsel
   U.S. Department of Homeland Security
   245 Murray Lane, SW
   Mail Stop 0485
   Washington, DC 20528-0485

*and*

U.S. CITIZENSHIP AND IMMIGRATION
SERVICES,
   c/o Office of the General Counsel
   U.S. Department of Homeland Security
   245 Murray Lane, SW
   Mail Stop 0485
   Washington, DC 20528-0485,

      *Defendants*.

## **COMPLAINT**

Plaintiffs National Venture Capital Association, Atma Krishna, Anand Krishna, Omni

Labs, Inc., and Peak Labs LLC d/b/a Occasion bring this Complaint against Defendants Elaine

Duke, in her official capacity as Acting Secretary of Homeland Security, the U.S. Department of

Homeland Security ("DHS"), James McCament, in his official capacity as Acting Director of

U.S. Citizenship and Immigration Services, and U.S. Citizenship and Immigration Services

("USCIS"), and allege as follows:

### **Introduction**

1.     This case involves the Trump Administration's unlawful delay of the start date of

the International Entrepreneur Rule ("the Rule"), 82 Fed. Reg. 5,238 (Jan. 17, 2017), a final

agency rule which permits foreign entrepreneurs to travel to or stay in the United States to grow

new companies—companies that hire U.S. workers, contribute to the U.S. economy, and benefit the United States as a whole.

2.      The U.S. economy has long thrived on the contributions of immigrant entrepreneurs, who bring their talents, ideas, and initiative with them to the United States. Indeed, "[t]he United States is the envy of the world when it comes to startups and entrepreneurship." *Comments Regarding International Entrepreneur Rule*, Nat'l Venture Capital Ass'n 1 (Oct. 13, 2016), https://goo.gl/GxuoRW. "The American economy stands apart because, more than any other place on earth, talented people from around the globe want to come here to start their businesses." P'ship for a New Am. Econ., *The "New American" Fortune 500*, at 5 (2011), http://goo.gl/yc0h7u.

3.      However, foreign entrepreneurs who seek to found new businesses in the United States face significant barriers to obtaining permission to travel and work in the United States. The United States lacks a dedicated visa for foreign entrepreneurs, and those entrepreneurs may not qualify for existing employment-based or family-based visas. Likewise, because some of those categories have strict numerical caps, they may reach capacity before an entrepreneur can qualify.

4.      To alleviate these problems and facilitate entrepreneurship, the federal government promulgated the International Entrepreneur Rule after soliciting and receiving extensive input from affected entrepreneurs, the business community, and the American people over forty-five days. 82 Fed. Reg. 5,238.

5.      Beginning on July 17, 2017, the Rule was to allow foreign entrepreneurs to apply for parole, a form of temporary immigration status—not a visa—that entitles the recipient to be present in the United States without being formally admitted. *Id.* The Rule reserved parole for

only the most qualified and talented entrepreneurs: applicants must show that they have a substantial role and ownership stake in a company founded in the United States in the last five years, and must also show that the company received a substantial amount of funding from U.S. investors or present other comparable "evidence of substantial and demonstrated potential for rapid business growth and job creation." *Id.* at 5,239. While recipients cannot obtain lawful permanent resident status while on parole, the Rule would authorize them to work and, in some cases, to bring eligible family members to the United States as well. *Id.*

6.      On July 11, less than *one week* before the Rule was scheduled to take effect, the Trump Administration—including Defendants in this action—announced that the effective date of the Rule would be delayed until March 14, 2018. *See International Entrepreneur Rule: Delay of Effective Date*, 82 Fed. Reg. 31,887 (July 11, 2017).

7.      Defendants justified the Rule's postponement on the grounds that it would allow them to reconsider the rule in light of an executive order issued by President Donald J. Trump that directs the Secretary of Homeland Security to "ensure that parole authority … is exercised only on a case-by-case basis." *See Border Security and Immigration Enforcement Improvements*, Exec. Order No. 13,767, 82 Fed. Reg. 8,793 (Jan. 25, 2017). As Defendants themselves admit, this "delay" is nothing more than a *de facto* repeal of the Rule, "[g]iven that DHS will be proposing to rescind the IE final rule, and may ultimately eliminate the program." 82 Fed. Reg. at 31,888; *see also id.* (explaining that rescission is "highly likely").

8.      In sharp contrast to the circumstances under which the Rule was promulgated, Defendants did not provide *any* notice or opportunity for advance comment to the public. *Id.* at 31,887. Instead, Defendants offered what they referred to as "post-promulgation public

comments" on their decision to delay the Rule—*i.e.*, a chance for the public to voice its opinions after the administration had already made up its mind. *Id.* at 31,888.

9.      Defendants justified their failure to offer advance notice-and-comment by reference to the Administrative Procedure Act's ("APA") "good cause exception to public participation," which allows an agency to dispense with notice and comment in extraordinary circumstances. *Id.* at 31,887 (citing 5 U.S.C. § 553(b)(B)). Specifically, Defendants asserted that "[u]ndertaking notice and comment rulemaking … is contrary to the public interest" because it would require them to expend "limited agency resources" implementing a Rule that will almost certainly be rescinded, and would encourage the public to rely on the Rule in the interim. *Id.* at 31,888. Defendants' rationale only further reveals that Defendants have no intention whatsoever of considering the public's views.

10.     Defendants' delay is unlawful under the APA. In light of the manifest importance of public participation in agency decision-making, courts have repeatedly explained that advance notice-and-comment is the *default*; the "good cause" exception to notice-and-comment rulemaking must be narrowly construed and invoked only in extraordinary circumstances. None of the rationales proffered by Defendants constitute good cause. Indeed, Defendants could have easily given the public an opportunity for comment during the *six months* between when the final Rule was promulgated and when the Trump Administration finally decided to delay the Rule— especially given that President Trump issued the executive order that supposedly pushed DHS to reconsider the Rule just one week after the Rule was promulgated.

11.     Thus, Plaintiffs request that the Court declare that the delay of the Rule is invalid, and enjoin Defendants to begin accepting and adjudicating parole applications from qualified entrepreneurs.

## Parties

### A.    Plaintiffs

12.    Plaintiffs in this case are the nation's leading organization of venture capitalists, prospective entrepreneur applicants under the Rule, and companies founded by potential applicants.

### 1.    National Venture Capital Association

13.    Plaintiff National Venture Capital Association ("NVCA") is the largest organization of venture capitalists in the United States. "NVCA has a diverse membership base of venture capital firms." *Members*, Nat'l Venture Capital Ass'n, https://goo.gl/8TNr4y (last visited Sept. 18, 2017).  NVCA's membership is spread across the country, investing in sectors as varied as biopharmaceuticals, information technology, and cybersecurity, and in companies at various stages of growth. Many of NVCA's members, or the companies they have invested in, were founded by, employ, or otherwise rely on the contributions of immigrants.

14.    "As the voice of the U.S. venture capital community," NVCA "empowers its members and the entrepreneurs they fund by advocating for policies that encourage innovation and reward long-term investment." *Who We Are*, Nat'l Venture Capital Ass'n, https://goo.gl/ef1wtW (last visited Sept. 18, 2017). NVCA also "serves as the definitive resource for venture capital data and unites its member firms through a full range of professional services." *Id.* "Because so many venture-backed entrepreneurs are immigrants," the NVCA has long pushed for immigration solutions that would benefit entrepreneurs, investors, and the U.S. economy. *Immigration*, Nat'l Venture Capital Ass'n, https://goo.gl/61vZVm (last visited Sept. 18, 2017).

15.    Pursuant to its institutional mission, the NVCA supported the International Entrepreneur Rule, explaining why the Rule would benefit American investors and the economy

as a whole. *See, e.g.*, *Comments Regarding International Entrepreneur Rule*, *supra*; *Teleconference Questions: Future "Significant Public Benefit" Parole Program for Entrepreneurs*, Nat'l Venture Capital Ass'n (June 25, 2015), https://goo.gl/aoK8xg.

16.     As NVCA has explained, "[t]he International Entrepreneur Rule will accelerate entrepreneurship and job creation by allowing talented startup founders to build successful enterprises in the United States, rather than overseas." *Comments Regarding International Entrepreneur Rule*, *supra*, at 1. The Rule would help "attract[] the world's greatest entrepreneurs back to the United States where they can build companies that will revolutionize industries and ensure our economy is dynamic well into the future." *Id.* at 7.

17.     NVCA has also repeatedly urged the Trump Administration to maintain the Rule and expeditiously implement it. *See, e.g.*, *Comments Regarding International Entrepreneur Rule: Delay of Effective Date*, Nat'l Venture Capital Ass'n (Aug. 3, 2017), https://goo.gl/YwDZCc; *Delay of International Entrepreneur Rule Missed Opportunity to Strengthen Economy and Create American Jobs*, Nat'l Venture Capital Ass'n (July 10, 2017), https://goo.gl/Uyv5Lx; Letter to President Donald J. Trump from Arizona Bioindustry Ass'n et al. at 1 (May 23, 2017), https://goo.gl/2YgXXQ; Letter to President Donald J. Trump from Engine and the Nat'l Venture Capital Ass'n (Feb. 7, 2017), https://goo.gl/9US2Sv.

18.     In particular, NVCA has expressed its "profound disappointment that [DHS] has delayed the effective date of the *International Entrepreneur Rule* and plans to propose to rescind the rule." *Comments Regarding International Entrepreneur Rule: Delay of Effective Date*, *supra*, at 1. In NVCA's view, delaying the Rule "contrasts with President Trump's goal of spreading economic prosperity across the United States and ensuring the U.S. remains the global leader in innovation." *Id.* "The United States must keep in place the International Entrepreneur Rule to

attract the best entrepreneurs rather than push them away." *Id.* at 2. Defendants' contrary decision "represents a fundamental misunderstanding of the critical role immigrant entrepreneurs play in growing the next generation of American companies." *Delay of International Entrepreneur Rule Missed Opportunity*, *supra*.

19.     If the effective date of the Rule continues to be postponed, NVCA's members will be harmed. Many of NVCA's members invest in companies founded by foreign entrepreneurs. The suspension of the Rule—and the inability of entrepreneurs to apply for parole—would impact the ability of NVCA's members to invest in companies with foreign entrepreneurs.

20.     NVCA members actively seek to invest in the world's leading entrepreneurs—many of whom are not U.S. citizens. The suspension of the Rule has made it more difficult for NVCA's members to make new investments in companies founded by foreign entrepreneurs, given that investors must consider the possibility that those entrepreneurs will be unable to come to the United States. Indeed, venture capital investing is considered a "high touch" business—venture capitalists serve as counselors to the startups in which they invest, they often serve on those startups' boards, and they are generally much more intertwined with the startup than an ordinary investor. NVCA members have a clear interest in requiring Defendants to abide by the law and implement the Rule.

### 2.     Atma and Anand Krishna

21.     Plaintiffs Atma and Anand Krishna, brothers and citizens of the United Kingdom, are the founders of LotusPay, which provides a platform for companies to digitally collect recurring payments. Specifically, LotusPay "has built the payments infrastructure that can be used by businesses to avoid having to build it out themselves." Ryan Lawler et al., *All the Companies from Y Combinator's Summer 2017 Demo Day (Day 2)*, TechCrunch (Aug. 22,

2017), https://goo.gl/4d4ooL. After it succeeds in India, LotusPay hopes to launch its platform in the United States in the near future.

22.     LotusPay was one of a select few companies chosen by startup accelerator Y Combinator for its Summer 2017 class. Y Combinator has been referred to as "the startup factory that has emerged as the most effective gateway to Silicon Valley success." Max Chafkin, *Y Combinator President Sam Altman Is Dreaming Big*, Fast Company (Apr. 16, 2015), https://goo.gl/8KqxN3. Major companies that have received funding from Y Combinator include AirBnB, Doordash, Dropbox, and Reddit.

23.     As part of Y Combinator's Summer 2017 class, LotusPay received $120,000 in funding. Atma and Anand also spent three months in Silicon Valley with Y Combinator, improving LotusPay and refining their pitch to outside investors. Ultimately, the Krishnas presented LotusPay at Y Combinator's second summer "Demo Day" to a select audience of investors. Since then, LotusPay has formally launched, and already has a lengthy waiting list of prospective customers.

24.     LotusPay consists of an entity founded in India in June 2016, as well as a holding company incorporated in Delaware in May 2017, which owns the entire business. LotusPay established its U.S. holding company as a condition of participating in the Y Combinator program, and has attracted even more interest from international investors as a result.

25.     Despite the immense early promise that LotusPay has shown, Atma and Anand are faced with a dilemma. The Y Combinator program has ended. While Anand is in the United States on B-1 business visitor status, he will soon have to leave the country when his visa expires. Atma has already left the country. Neither has been able to obtain any other form of lawful status. Certain potential options, such as an O-1 visa, are both expensive and impose an

exceptionally high bar for potential petitioners since entrepreneurs in this category must demonstrate sustained national or international acclaim in business—a standard so high that even many entrepreneurs with high "potential for rapid business growth and job creation" cannot reasonably meet it.

26.     To that end, the Krishnas had planned to apply for parole under the International Entrepreneur Rule to enable them to build on the progress they made in the Y Combinator program, to solicit additional investment in the United States, and to expand LotusPay's product offering to the United States. The U.S. market is very attractive to LotusPay, and LotusPay's platform for digitally processing payments would be a boon to U.S.-based companies and the economy as a whole.

27.     Atma and Anand are both eminently qualified to apply for parole under the Rule. Each is integral to LotusPay's operations. Atma is the Chief Executive Officer of LotusPay, while Anand is the Head of Marketing, charged with locating potential customers. Atma owns the majority of LotusPay, and Anand owns a significant equity share of the company as well.

28.     Because the Rule has been delayed, however, the Krishnas have been unable to apply for parole under the Rule, and have been unable to obtain any other form of lawful status in the United States. Their inability to do so makes it far more difficult to launch their platform in the United States or hire U.S.-based employees, and makes it impossible to work in the same location with any employees they might hire in the United States. And it likewise makes it difficult to obtain additional investment from U.S.-based investors, who would understandably prefer to invest in companies with founders based in the United States.

### 3.     Omni Labs, Inc.

29.     Omni Labs, Inc. provides companies with a platform for data visualization and analytics to aid in their marketing operations. Omni aims to "empower[] marketers with the tools

required to truly execute data-driven marketing." *Who We Are*, Omni Labs, https://goo.gl/DR3CtY (last visited Sept. 18, 2017). Omni consists of an entity founded in June 2015 in the United States, where its principal operations are focused, as well as an entity in Vancouver founded this year.

30.     Omni has grown exponentially over the course of the last several months. Since January 2017, it has gone from 5 customers to 140 customers, all businesses. Omni will continue to grow and succeed in the near future. Indeed, Omni is already cash-flow positive, which is unusual for a startup at its stage of development. While Omni has largely been self-funded up to this point, it intends to aggressively seek investment, including in the United States.

31.     Omni's growth is even more remarkable given the tremendous hurdles the company has had to surmount to get off the ground. Two of Omni's founders—Nishant Srivastava and Vikram Tiwari—are citizens of India. Over the last few years, Nishant, Vikram, and Omni have applied for L-1 and H-1B visas, for which Omni spent thousands of dollars in filing fees and attorneys' fees with no success. Ultimately, Nishant and Vikram were forced to obtain work permits in Canada, where they are based today.

32.     Omni had planned to assist Nishant and Vikram in applying for parole under the Rule. Both would be able to qualify for the Rule if it went into effect: they would have equity stakes above 10%, and both are integral to the success of the company. In addition to being core members of the founding team, both play essential engineering roles in the company, and make all relevant decisions within their domains with respect to hiring staff and allocating resources. Both would be exemplary candidates for parole, if the Rule had gone into effect.

33.     Because Nishant and Vikram cannot come to the United States, Omni has been forced to establish and maintain a Vancouver office at great expense—something it otherwise

would not have done. Aside from the costs of setting up the office and obtaining legal status in Canada for Nishant and Vikram, Omni's U.S.-based employees must either work with Nishant and Vikram remotely or physically travel to Vancouver, which they do roughly once every two months. Simply put, Nishant and Vikram's inability to obtain lawful status or parole has been a significant hindrance to Omni's operations and growth, and thereby makes it more difficult to acquire U.S. investment in the future.

### 4.    Peak Labs LLC d/b/a Occasion

34.    Peak Labs LLC, which does business as Occasion, is a platform that service providers can use to book appointments and receive payments. Specifically, "its tools let businesses create calendars, accept bookings and payments, and offer bookings through their websites and Facebook pages." Amina Elahi, *Occasion Raises $1.25M to Help You Split the Cost of Group Activities*, Chi. Tribune (Oct. 25, 2016, 8:00 AM), http://goo.gl/3vaxR9. Occasion launched its platform on August 21, 2013, and formally incorporated as Peak Labs LLC in Illinois on August 28, 2014. Occasion already has six employees in the United States, and expects to hire more as it continues to expand.

35.    Although it launched just over four years ago, Occasion has grown rapidly, virtually doubling in customers every year. It has already built a customer base of over 3,500 business consumers, and over 500,000 individual consumers have used Occasion to make at least one booking. Even these figures likely understate Occasion's potential for growth, considering that Occasion is still developing its product. And, by providing a booking platform for small businesses, Occasion helps those businesses to increase their customer base as well.

36.    Occasion's success has also been recognized by investors. Occasion has received almost *$1.5 million* in investments from U.S. angel funds, including the Hyde Park Angels and the Harvard Business School Alumni Angels of Chicago. Each has invested in dozens of other

successful companies. Occasion has been able to attract so much outside funding because of its team, which investors see as "really smart, innovative and scrappy entrepreneurs." Elahi, *supra*.

37.     Yet Occasion, too, has been hindered by the inability of one of its founders to obtain permission to travel and work in the United States. Its Chief Architect, Pelle ten Cates, is a citizen of the Netherlands, and works out of an office in the Netherlands. He has applied for numerous visa categories, including H-1B, but has yet to be able to receive lawful status in the United States.

38.     Pelle intended to apply for entrepreneur parole and would have qualified had Defendants not unlawfully postponed the Rule's effective date. Pelle already owns roughly 14-15% of Occasion. Pelle is also integral to Occasion's operations: as the Chief Architect, he serves as the "brains" behind the software and Occasion's database, and also serves as quality assurance for all of Occasion's code. In addition, Pelle oversees and manages Occasion's entire engineering team, which comprises four U.S.-based employees.

39.     Pelle's inability to come to the United States has hampered Occasion's operations and growth. It is difficult for him to supervise a U.S.-based team from the Netherlands, given the physical distance and the difference in time zones. Indeed, Occasion's engineering team frequently has to travel to the Netherlands to work in the same location as Pelle. Moreover, having its Chief Architect work from abroad has made it more challenging for Occasion to attract additional capital from investors in the United States.

**B.     Defendants**

40.     Defendant Elaine Duke is the Acting Secretary of Homeland Security, and therefore the "head" of the Department of Homeland Security. 6 U.S.C. § 112(a)(2). Under the Immigration and Nationality Act, she is charged with administering and enforcing the federal

immigration and nationality laws (8 U.S.C. § 1103(a)(1), (3)), including the rules governing parole (6 U.S.C. § 202(4)). She is sued in her official capacity.

41.     Defendant Department of Homeland Security ("DHS") is the executive department charged with authority over federal immigration law, *see* 6 U.S.C. § 251, and an "agency" within the meaning of the APA, 5 U.S.C. § 551(1). DHS is the federal agency under which authority both the Rule and the delay of the Rule were promulgated. *See* 82 Fed. Reg. at 5,238; 82 Fed. Reg. at 31,887.

42.     Defendant James McCament is the Acting Director of U.S. Citizenship and Immigration Services, and therefore the "head" of that agency, 6 U.S.C. § 271(a)(2). He is sued in his official capacity.

43.     Defendant U.S. Citizenship and Immigration Services ("USCIS") is a component of DHS, 6 U.S.C. § 271, and an "agency" within the meaning of the APA, 5 U.S.C. § 551(1). USCIS is the component of DHS under which authority both the Rule and the delay of the Rule were promulgated. *See* 82 Fed. Reg. at 5,238; 82 Fed. Reg. at 31,887.

## Jurisdiction and Venue

44.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. There exists between the parties an actual and justiciable controversy in which Plaintiffs seek declaratory and injunctive relief to protect their legal rights.

45.     Defendants' delay of the Rule constitutes "final agency action" reviewable under the APA. 5 U.S.C. § 704; *see, e.g.*, *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) ("an order delaying [a] rule's effective date … [is] tantamount to amending or revoking a rule," and constitutes reviewable final agency action).

46.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e)(1) because defendants reside in the District of Columbia.

**Immigrant Entrepreneurs Benefit the United States**

47.     It is impossible to overstate the benefits that immigrant entrepreneurs and companies have provided to the American economy and the nation as a whole, and the concomitant importance of ensuring that immigrant entrepreneurs can come to the United States to continue to grow their businesses.

48.     To start, immigrants found businesses at astounding rates. "Immigrants continue to be a lot more likely than the native-born to become entrepreneurs"—indeed, nearly *twice* as likely. Robert W. Fairlie et al., *The 2016 Kauffman Index: Startup Activity*, Ewing Marion Kauffman Found. 7 (Aug. 2016), https://goo.gl/6Wr5Mc; *see also* Kristie De Peña, *Immigration Policy Brief: Entrepreneurial Visas*, Niskanen Cntr. (July 2017), https://goo.gl/ZwC5h2 ("Immigrants are twice as likely to start a business.").

49.     "Immigrants constitute 15% of the general U.S. workforce, but they account for around a quarter of U.S. entrepreneurs." Sari Pekkala Kerr & William R. Kerr, *Immigrants Play A Disproportionate Role in American Entrepreneurship*, Harv. Bus. Rev. (Oct. 3, 2016), https://goo.gl/XoBFrL. And the "immigrant share of entrepreneurship has been increasing dramatically since the mid-1990s." *Id.* Today, "35%-40% of new firms have at least one immigrant entrepreneur connected to the firm's creation." *Id.*

50.     Immigrant entrepreneurs are especially prevalent in the engineering and technology sectors. "[A]t least one key founder was foreign-born" in 25.3% of engineering and technology companies founded between 1995 and 2005. Vivek Wadhwa et al., *America's New Immigrant Entrepreneurs*, Duke Univ. & Univ. Cal.-Berkeley 4 (Jan. 4, 2007), https://goo.gl/ox8oVQ.

51.     The businesses that immigrant entrepreneurs have founded in the United States have become some of the nation's most prominent companies, providing many of its most well-

known products and services. The Fortune 500 is filled with immigrant entrepreneurs—*40.2 percent* of 2016 Fortune 500 firms have "at least one founder who either immigrated to the U.S. or who was the child of immigrants." *Entrepreneurship*, New Am. Econ., https://goo.gl/aTDAva. "Immigrants have started *more than half* (44 of 87) of America's startup companies valued at $1 billion dollars"—so-called "unicorns"—"and are key members of management and product development teams in *over 70 percent* (62 of 87) of these companies." Stuart Anderson, *Immigrants and Billion Dollar Startups*, Nat'l Found. for Am. Pol'y 1 (Mar. 2016), https://goo.gl/Mk7iJM (emphasis added).

52.    Moreover, "[b]etween 2006 and 2012, immigrants started 33 percent of U.S. venture-backed companies that became publicly traded, a total of 92 such companies." Such companies "have a total market capitalization of $900 billion (as of June 2013)"—that's "higher than the exchanges of Russia, South Africa, and Taiwan." Stuart Anderson, *American Made 2.0: How Immigrant Entrepreneurs Continue to Contribute to the U.S. Economy*, Nat'l Venture Cap. Ass'n 5 (July 2013), https://goo.gl/uRRnt7.

53.    The names of companies founded or co-founded by immigrant entrepreneurs are familiar; they include household names like eBay (Pierre Omidyar), Facebook (Eduardo Saverin), Google (Sergey Brin), Intel (Andy Grove), LinkedIn (Konstantin Guericke, Jean-Luc Vaillant), Nordstrom (John W. Nordstrom), Panda Express (Andrew and Peggy Cherng), SanDisk (Eli Harari, Sanjay Mehrotra, and Jack Yuan), Tesla (Elon Musk), and Yahoo (Jerry Yang).

54.    Companies founded by immigrant entrepreneurs are powerful job creators. Indeed, "[i]mmigrant-entrepreneurs have created countless jobs and contributed profoundly to the U.S. economy." Denise C. Hammond, *Finally! The DHS Rule on International*

*Entrepreneurs Is Long Overdue*, Entrepreneur (May 25, 2017), https://goo.gl/w5CkMa. Immigrants create new jobs for U.S. citizens "through the businesses they establish … [and] play an important role in job creation in both small and large businesses." *Immigration: Myths and Facts*, U.S. Chamber of Commerce 3 (2016), https://goo.gl/NizPEQ.

55.     Even relatively new businesses founded by immigrant entrepreneurs fuel employment. "New and young companies are the primary source of job creation in the American economy." Jason Wiens & Chris Jackson, *The Importance of Young Firms for Economic Growth*, Ewing Marion Kauffman Found. 1 (Sept. 13, 2015), https://goo.gl/RSgToj. Indeed, "[c]ompanies less than five years old create an average of 1.5 million new jobs for Americans each year." *Entrepreneurship*, *supra*. "And immigrants play a particularly important role driving this trend—founding businesses at far higher rates than the U.S. population overall." *Id.*

56.     Despite the many benefits immigrant entrepreneurs bring the United States, it is often difficult for them to bring themselves. "Currently there is no clear path for foreign-born entrepreneurs to start companies in the U.S. and founders have to navigate obstacles with the existing visa options to gain legal residency." Aditi Roy & Paayal Zaveri, *Start-Up Execs Urge Trump Not to Kill Special "Start-Up Visa" For Entrepreneurs*, CNBC (June 19, 2017, 6:25 PM), https://goo.gl/VJnkTp. "Unlike more than a dozen other countries, the United States has no visa for immigrant entrepreneurs." Jason Wiens, *International Entrepreneur Rule: The Good, the Bad, and the Unknown*, Ewing Marion Kauffman Found. (Oct. 17, 2016), https://goo.gl/a3oGh2.

57.     Other visa options are frequently unavailable. "While F-1 STEM graduates can start a business during post-graduation 'practical training,' they are limited to three years time." Denise C. Hammond, *Finally! The DHS Rule on International Entrepreneurs Is Long Overdue*, Entrepreneur (May 25, 2017), https://goo.gl/bBxBgh. "The H-1B visa also is now beyond reach

due to the lottery, to restrictions on self-employment and to the Trump Administration's singular focus on alleged abuse." *Id.* And an EB-5 visa requires a substantial personal investment—either $1 million, or $500,000 in a "high-unemployment" or "rural" area. *About the EB-5 Visa Classification*, U.S. Citizenship & Immig. Servs., (last visited Sept. 18, 2017). https://goo.gl/PvewfB.

58.     The lack of viable paths for foreign entrepreneurs to legally come to the United States puts it at a serious disadvantage in the global economy. "OECD countries have been actively pursuing foreign investors and entrepreneurs, with the aim of increasing investment and creating jobs for the benefit of the national economy." *International Migration Outlook 2017*, Org. Econ. Co-operation & Dev. 46 (41st ed. 2017). Canada, for instance, has already "tried to lure Silicon Valley talent" through open immigration policies. Kim Hart, *Canada's Play for Immigrant Tech Talent*, Axios (July 5, 2017), https://goo.gl/5VwEoj. "Australia, Canada, Chile, Ireland, and New Zealand all have visa grants or other programs to attract entrepreneurs." Joe Mullin, *Trump Begins to Dismantle Obama's "Startup Visa" Program*, Ars Technica (July 10, 2017, 3:15 PM), https://goo.gl/A84WuA.

59.     Ultimately, "existing laws force many bright and highly educated immigrants to return to their countries of origin every year." Steven Overly, *Obama Administration Proposes New Visa Rule for Immigrant Entrepreneurs*, Wash. Post (Aug. 26, 2016), https://goo.gl/J3roP1. "Those individuals then start companies abroad that compete with U.S. firms, … rather than building those companies here and hiring American workers." *Id.*

### The International Entrepreneur Rule

60.     To solve this problem, the Obama Administration promulgated the International Entrepreneur Rule, designed to "facilitate the ability of certain promising startup founders to begin growing their companies within the United States, contingent on factors such as significant

financing from U.S. investors." Tom Kalil & Doug Rand, The White House, *Welcoming International Entrepreneurs: Obama Administration Announces New Steps to Attract the Best and Brightest*, Medium (Aug. 26, 2016), https://goo.gl/ogCDan.

61.     On August 26, 2016, DHS published a notice of proposed rulemaking in the Federal Register for the International Entrepreneur Rule. 81 Fed. Reg. 60,129.

62.     The rule proposed by DHS underwent substantial public comment and debate. Specifically, DHS received 763 comments on the rule over a 45-day period. 82 Fed. Reg. at 5,244. A majority of the comments expressed support for the rule. *Id.* For example, the National Venture Capital Association wrote that the rule would attract "the world's greatest entrepreneurs back to the United States where they can build companies that will revolutionize industries and ensure our economy is dynamic well into the future." *Comments*, Nat'l Venture Capital Ass'n, *supra*, at 7.

63.     DHS carefully "reviewed all of the public comments received in response to the proposed rule and addresse[d] relevant comments in th[e] final rule," over the course of thirty pages. *Id.* at 5,244, 5,244-73. Indeed, DHS made substantial changes to the rule as a result of the comments it received. *Id.* at 5,241. Specifically, DHS adjusted several of the thresholds needed to qualify for the rule, including the amount of investment in the applicant's entity and the applicant's ownership stake in the entity. *Id.*

64.     On January 17, 2017, DHS published the final Rule. *Id.* at 5,238.

65.     Under the Rule, an applicant must meet several criteria to be considered for a discretionary grant of parole. *Id.* at 5,239.

66.     First, the applicant must have formed a new company in the United States within the five years preceding his or her application. *Id.* The company must have "lawfully done

business since its creation," and must also have "substantial potential for rapid growth and job creation." *Id.*

67.     Second, the applicant must be "an entrepreneur of the start-up entity who is well-positioned to advance the entity's business." *Id.* Specifically, the applicant must possess "a significant (at least 10 percent) ownership interest in the entity," and must have "an active and central role in the operations and future growth of the entity, such that his or her knowledge, skills, or experience would substantially assist the entity in conducting and growing its business in the United States." *Id.*

68.     Third, the applicant must "further validate, through reliable supporting evidence, the entity's substantial potential for rapid growth and job creation." *Id.* The applicant may do so in several ways: (1) by showing "that the entity has received significant investment of capital from certain qualified U.S. investors with established records of successful investments," which will usually amount to $250,000 or more; (2) by showing that the entity "has received significant awards or grants from Federal, State, or local government entities," which will usually amount to $100,000 or more; or (3) by providing additional evidence that "serve[s] as compelling validation of the entity's substantial potential for rapid growth and job creation." *Id.*

69.     However, parole is not automatic even if the applicant meets the criteria specified in the Rule. Ultimately, an adjudicator must "conclude, based on the totality of the circumstances, that both: (1) The applicant's parole would provide a significant public benefit, and (2) the applicant merits a grant of parole as a matter of discretion." *Id.*

70.     Under the Rule, the applicant, as well as his or her spouse and unmarried minor children, "may be considered under this rule for a discretionary grant of parole lasting up to 30 months." *Id.* While the applicant "will be authorized for employment incident to the grant of

- 20 -

parole," spouses and children must apply separately. *Id.* An applicant who receives parole may also apply for a single additional 30-month period of parole, and must meet criteria similar to those required for an initial application. *Id.* at 5,240. Parolees under the Rule are ineligible to adjust or change their status in the United States, and must generally leave the United States before applying for a visa. *Id.*

71.     With the Rule, DHS also published many of the documents applicants will need to apply for parole, including the Application for Entrepreneur Parole (I-941) form and its accompanying instructions. *See International Entrepreneur Rule*, Fed. Reg. (Aug. 31, 2016), https://goo.gl/1eY35W.

72.     As DHS noted, the Rule falls well within the Secretary of Homeland Security's authority under current law to "parole individuals into the United States, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit." 82 Fed. Reg. at 5,244 (citing 8 U.S.C. § 1182(d)(5)). While the Rule "would establish general criteria for the use of parole with respect to entrepreneurs, … whether to parole a particular individual" would remain "a discretionary determination that would be made on a case-by-case basis." *Id.*; *see also id.* at 5,238-39 (summarizing the legal authority for the Rule).

73.     According to DHS, the final Rule "would increase and enhance entrepreneurship, innovation, and job creation in the United States." *Id.* at 5,238. Specifically, the Rule would "encourage foreign entrepreneurs to create and develop start-up entities with high growth potential in the United States, which are expected to facilitate research and development in the country, create jobs for U.S. workers, and otherwise benefit the U.S. economy through increased business activity, innovation, and dynamism." *Id.* DHS "believe[d] that many of the start-up firms operated by international entrepreneurs during the parole period could eventually become

high-growth firms that generate exceptionally high levels of economic activity and contribute disproportionately to job creation in the United States." *Id.* at 5,283.

74.    DHS rejected the idea that the Rule would harm the U.S. labor market. As DHS explained, "there is no reason to expect that substantial negative consequences, including adverse impact on domestic workers, are likely." *Id.* at 5,282. Indeed, DHS thought that "the literature much more decisively indicates a strong potential of creating new net jobs for U.S. workers." *Id.* at 5,271. Similarly, a recent study found that 135,240 American jobs would be created in the first ten years following the Rule's implementation. *International Entrepreneur Rule: What Might It Mean for U.S. Workers?*, P'ship for New Am. Econ. (July 10, 2017), https://goo.gl/bcbQr7.

75.    DHS gave the final Rule an effective date six months after promulgation, on July 17, 2017. *Id.* at 5,242. According to DHS, those six months "would provide USCIS with a reasonable period to ensure resources are in place to process and adjudicate Applications for Entrepreneur Parole." *Id.*

76.    Ultimately, the final Rule was a compromise between the interests of the business community, which favored a generous rule to promote entrepreneurship in the United States, and certain commentators who sought more stringent limitations on immigration. The "entrepreneur parole process would not have been a cakewalk for applicants: only those who could meet the stringent requirements associated with it would be able [to] qualify." Mintz Levin, *Opportunity Foreclosed: The International Entrepreneur Rule May Die Before It Gets Out of the Gate*, Nat'l L. Rev. (July 13, 2017), https://goo.gl/H9bLeN. While advocates viewed the Rule as "a step in the right direction," they noted that "ultimately it [would] only serve a segment of U.S. entrepreneurs." John Mannes, *Newly Proposed Rules for Foreign Entrepreneurs Will Help Some, But Not All, Found U.S. Startups*, TechCrunch (Aug. 26, 2016), https://goo.gl/Siq34V. Even

those who received parole would be "offer[ed] no path to permanent citizenship." Trisha Thadani, *Trump Administration Officially Delays 'Startup Visa' Rule*, SFGate (July 10, 2017, 9:18 PM), https://goo.gl/eaERCd.

77.     Nevertheless, "[t]he U.S. and worldwide entrepreneur community had been looking forward to July 17th with great anticipation." Mintz Levin, *supra*. On May 23, 2017, eighty "startup founders, investors, economic development organizations, and civic leaders" wrote to the administration to "strongly encourage [it] to begin accepting applications" on the Rule's effective date, so that the United States could "reap the considerable economic and job-creation benefits of attracting and retaining more of the world's most talented entrepreneurs." Letter to President Donald J. Trump from Arizona Bioindustry Ass'n et al., *supra*, at 1. Indeed, DHS estimated that 2,940 entrepreneurs would apply for parole under the Rule each year. 82 Fed. Reg. at 5,242.

## The Unlawful Delay of the Rule

78.     On July 11, 2017, less than *one week* before the Rule was to take effect, DHS published a new "final rule" purporting to "temporarily delay[] the effective date of the International Entrepreneur Final Rule." 82 Fed. Reg. 31,887. Under DHS's new rule, the effective date of the Rule would be pushed back almost a year, to March 14, 2018. *Id.*

79.     According to DHS, "[t]his delay will provide DHS with an opportunity to obtain comments from the public regarding a proposal to rescind the rule pursuant to Executive Order (E.O.) 13767, 'Border Security and Immigration Enforcement Improvements.'" *Id.*

80.     The process followed by DHS in deciding to delay the effective date of the Rule was the polar opposite of the careful, deliberative process DHS used to formulate the Rule itself. DHS provided no advance notice of the delay, nor did it give the public any opportunity to comment on DHS's decision in advance. Instead, DHS gave the public a chance for "post-

promulgation public comments on the decision to delay the IE Final Rule" (*id.* at 31,888)—*i.e.*, a chance for the public to voice its opinions after DHS had already made up its mind.

81.     DHS defended its decision to eschew ordinary notice-and-comment procedures by invoking the APA's "good cause" exception, which permits an agency to forgo notice and comment if the agency finds that "those procedures are 'impracticable, unnecessary, or contrary to the public interest.'" *Id.* at 31,877 (quoting 5 U.S.C. § 553(b)(B)).

82.     According to DHS, it had good cause because "USCIS would be required to expend limited agency resources to implement the IE Final Rule," which it might not recoup via filing fees, "[g]iven that DHS will be proposing to rescind the IE Final Rule, and may ultimately eliminate the program." *Id.* at 31,888.

83.     Moreover, DHS worried that giving the public an opportunity for notice and comment when it ultimately intended to rescind the Rule "would sow confusion and would likely cause the waste of resources by multiple stakeholders with interests in this rulemaking." *Id.* "Allowing the IE Final rule to go into effect … would lead the public to continue to rely on the rule," which could "include expending significant effort and resources in order to establish eligibility." *Id.*

84.     As DHS made abundantly clear, it ultimately intends to rescind the Rule. *Id.* Its decision to nonetheless give the public an opportunity for "post-promulgation" notice and comment on its decision to delay the Rule is nothing more than theater.

85.     The delay of the Rule invited sharp criticism from "entrepreneurs, immigration lawyers, and advocacy groups." Sara Ashley O'Brien, *"Startup Visa" Alternative Delayed by Trump Administration*, CNNTech (July 11, 2017, 3:31 AM), https://goo.gl/sSmuvu. And it "was quickly slammed by business leaders and organizations, especially from the technology sector,

which has benefited heavily from start-ups founded by immigrants." Nick Wingfield, *In Blow to Tech Industry, Trump Shelves Start-Up Immigrant Rule*, N.Y. Times (July 10, 2017), https://goo.gl/2WD53E.

86.     Undoubtedly, "[o]ther countries will benefit from the vacuum that will be created by the dissolution of this rule." Mintz Levin, *supra*. If the delay of the Rule is allowed to stand, "the U.S. will have lost a major battle in the highly competitive, global war for talent." *Id.* "[O]ther countries—including Canada, France, Mexico, and China—may be more than willing to pick up the slack." Aine Cain, *The Trump Administration Delayed a Rule Meant to Help People Launch Businesses in the US*, Bus. Insider (July 21, 2017, 11:09 AM), https://goo.gl/fzKvLc.

## The Harm Caused to Plaintiffs by the Delay

87.     The unlawful delay of the Rule severely and irreparably harms Plaintiffs.

88.     As explained above, NVCA's members are harmed by the delay of the Rule, and the NVCA is committed to fighting for their interests. NVCA's members have invested, will invest, or would consider investing in new companies that have founders who could apply for parole under the Rule. The delay of the Rule puts these investments in jeopardy and chills potential future investments. These injuries are at the core of NVCA's institutional mission to promote entrepreneurship and investment. Because this lawsuit challenges Defendants' procedural error, and requests that Defendants be required to put the Rule into place, NVCA is capable of litigating this case in its own capacity and without the direct participation of its members.

89.     Atma and Anand Krishna demonstrate how the delay of the Rule has harmed start-ups and their founders. Atma and Anand—who would have qualified to apply for parole— have lost an opportunity to come to the United States and grow the business into which they have dedicated significant time and resources. Their inability to remain in or come to the United States

will make it far harder for them to grow LotusPay and attract additional U.S.-based and international investment. And it will make it impossible for them to expand their operations and the product to the United States, which they have otherwise considered doing.

90.     The delay of the Rule also harms Omni and Occasion, companies which have founders who would have applied for parole under the Rule. If those entrepreneurs cannot come to the United States, Omni and Occasion will be deprived of their presence in the United States, and will not be nearly as competitive or successful as they would otherwise be. Forcing their founders to work remotely—across national borders and time zones—is a significant hardship that hampers effective communication, collaboration, and management for both Omni and Occasion. It costs them significant money to procure additional office space, pay for travel, and communicate remotely. Omni and Occasion will also have a far harder time attracting U.S. investment. Because their founders are trapped overseas, U.S. investors may be unwilling to risk providing capital to Omni and Occasion. Investors will understandably worry that they risk losing their investment if the company suffers from the absence of critical personnel.

91.     Each of these harms is occurring now, and cannot be rectified by a favorable decision on the merits later. So long as Atma and Anand, and Omni and Occasion's founders, cannot come to the United States, their respective companies will suffer—losing potential investments, struggling to develop their products, incurring greater costs, and growing more slowly than they otherwise would have. Similarly, the investments of NVCA's members may already have been impacted—and NVCA's members must now consider the absence of the Rule in making further investment decisions in companies headed by foreign entrepreneurs.

92.     These are precisely the sort of injuries that the Administrative Procedure Act and the Immigration and Nationality Act are meant to rectify. The INA provides that the purpose of

parole is to allow noncitizens to enter if they would provide "significant public benefit … to the United States." 8 U.S.C. § 1182(d)(5). And the APA provides a remedy where the government fails to follow the requisite procedures in promulgating rules governing the parole process. 5 U.S.C. § 706. Atma and Anand Krishna, as well as Omni and Occasion's founders, have an interest in applying for parole under the INA, and the NVCA's members are part of the public the INA is intended to benefit.

93.     Plaintiffs' injuries are all caused directly by the unlawful delay of the Rule. If the Rule had gone into effect, Atma and Anand Krishna, as well as Omni and Occasion's founders, would have applied for and likely benefited from the rule. Similarly, the harm to NVCA's members, including additional risk for their investments and chilling future investments, stems directly from the delay of the Rule.

94.     Additionally, if Defendants had provided an opportunity for notice and comment before delaying the Rule, Plaintiffs could have informed Defendants of their serious objections to delaying the Rule, and they may have convinced Defendants to adopt a different approach.

95.     For the same reason, Plaintiffs' injuries would be redressed by invalidating Defendants' unlawful delay, implementing the Rule now, and requiring that Defendants provide Plaintiffs with an opportunity for notice and comment before attempting to delay the Rule again.

## FIRST CAUSE OF ACTION

**The Delay of the International Entrepreneur Rule Violates the Notice-and-Comment Requirement of the Administrative Procedure Act, 5 U.S.C. § 553**

96.     Under the Administrative Procedure Act, an agency must provide "[g]eneral notice of proposed rule making … published in the Federal Register," whenever the agency seeks to promulgate a rule. 5 U.S.C. § 553(b). After the agency has published the required notice, "the agency shall give interested persons an opportunity to participate in the rule making through

submission of written data, views, or arguments." *Id.* § 553(c). The APA permits an agency to eschew notice-and-comment procedures only in limited circumstances, "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." *Id.* § 553(b)(B).

97.     Defendants did not provide advance notice-and-comment before delaying the effective date of the Rule. While Defendants invoke the APA's good cause exception to defend that decision, Defendants have failed to include an adequate statement of the reasons for their finding of good cause.

98.     Moreover, good cause is plainly lacking. Under the APA, "the good cause exception is to be 'narrowly construed and only reluctantly countenanced.'" *Mack Trucks, Inc. v. E.P.A.*, 682 F.3d 87, 93 (D.C. Cir. 2012) (quoting *Tennessee Gas Pipeline Co. v. F.E.R.C.*, 969 F.2d 1141, 1144 (D.C. Cir. 1992)). "[T]he onus is on the [agency] to establish that notice and comment is unnecessary." *Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 801 n.6 (D.C. Cir. 1983). Indeed, "[t]he public interest prong of the good cause exception is met only in the rare circumstance when ordinary procedures—generally presumed to serve the public interest—would in fact harm that interest." *Mack Trucks, Inc.*, 682 F.3d at 95. It only "excuses notice and comment in emergency situations … or where delay could result in serious harm." *Jifry v. F.A.A.*, 370 F.3d 1174, 1179 (D.C. Cir. 2004).

99.     Neither of DHS's claimed justifications for eschewing notice-and-comment constitute good cause under the APA. While DHS claims that it may have to expend agency resources to create a system for adjudicating applications, that is DHS's own fault. DHS could have offered the public an opportunity for notice and comment long before the Rule's effective

date. "Notice and comment can only be avoided in truly exceptional emergency situations, which notably, cannot arise as a result of the agency's own delay." *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 202 F. Supp. 3d 20, 26 (D.D.C. 2016), *aff'd*, 857 F.3d 907 (D.C. Cir. 2017).

100.     Moreover, the assertion that DHS will need to expend additional agency resources if it does not delay the effective date of the Rule is implausible. DHS cannot seriously contend that it intended to develop a system for adjudicating applications, yet took no steps to do so, until the final week before the Rule was to take effect. Either DHS *always* intended to delay the Rule, and could have easily offered an opportunity for notice and comment to the public, or DHS has already expended significant resources in developing such a system, and any additional resources DHS would expend are minimal. Indeed, DHS already promulgated several of the documents needed to apply for parole when it promulgated the final Rule.

101.     Finally, DHS did not provide any details or factual findings corroborating its assertion that it would be forced to expend significant resources in implementing the rule. *Cf. Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 705–07 (D.C. Cir. 2014) (rejecting claims of financial necessity where the agency did not offer "factual findings supporting the reality of the threat.").

102.     While DHS claims that the public would rely on the Rule to their detriment in the absence of an immediate delay, "a desire to provide immediate guidance, without more, does not suffice for good cause." *Mobil Oil Corp. v. Dep't of Energy*, 610 F.2d 796, 803 (Temp. Emer. Ct. App. 1979). And courts have rejected the argument that "an alleged pressing need to avoid industry compliance with regulations that were to be eliminated" constitutes good cause for bypassing notice-and-comment. *Envtl. Def. Fund, Inc. v. E.P.A.*, 716 F.2d 915, 920 (D.C. Cir.

1983). "Otherwise, an agency unwilling to provide notice or an opportunity to comment could simply wait until the eve of a statutory, judicial, or administrative deadline, then raise up the 'good cause' banner and promulgate rules without following APA procedures." *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981).

103.    Regardless, on information and belief, potential entrepreneurs, the companies they are associated with, and others had *already* taken steps to qualify for parole under the Rule before the Rule was delayed. For example, qualifying entrepreneurs and their companies may have already retained counsel to assist in applying for parole; begun preparing the paperwork and the required evidentiary support; and rearranged ownership stakes. Similarly, companies may have already taken action based on the possibility of parole, including soliciting additional investment, hiring additional employees, or expanding their operations. Thus, any harm to the public has already occurred as a result of DHS's last-minute decision to delay the Rule, and that harm continues.

104.    Moreover, any potential reliance interests were created by Defendants' own procrastination. Defendants could have offered the public an opportunity for notice and comment long before July 2017, when it ultimately postponed the effective date of the Rule, and thereby avoided creating any so-called reliance interests. Defendants' assertion that there was simply no time to give the public an opportunity for notice and comment before delaying the Rule is wholly untenable.

105.    DHS's solicitation of "post-promulgation" comments does not make up for its failure to offer advance notice and comment. The APA "is designed to give affected parties an opportunity to participate in agency decisionmaking early in the process, when the agency is

more likely to consider alternative ideas," and not after the agency has already made up its mind. *N. Arapahoe Tribe v. Hodel*, 808 F.2d 741, 751 (10th Cir. 1987).

106.    Thus, Defendants' failure to provide Plaintiffs with an opportunity for advance notice-and-comment is unlawful, and may be reviewed by this Court under 5 U.S.C. § 702.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

(a)   Declare that the delay of the International Entrepreneur Parole Rule violates the Administrative Procedure Act's notice-and-comment requirement and is therefore unlawful;

(b)   Enjoin the Defendants from delaying the effective date of the International Entrepreneur Parole Rule and require the Defendants to begin accepting and adjudicating applications from international entrepreneurs entitled under the Rule to apply for parole;

(c)   Award Plaintiffs their costs in this action, including their reasonable attorneys' fees incurred; and

(d)   Award such other relief as the Court deems just and proper.

Respectfully submitted,

*/s/Andrew J. Pincus*
Andrew J. Pincus (D.C. Bar No. 370762)
Paul W. Hughes (D.C. Bar No. 997235)
John T. Lewis (D.C. Bar No. 1033826)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3000
(202) 263-3300 (fax)

Melissa Crow (D.C. Bar No. 453487)
Mary Kenney (D.C. Bar No. 1044695)
Leslie K. Dellon (D.C. Bar No. 250316)
AMERICAN IMMIGRATION COUNCIL
1331 G St. NW, Suite 200
Washington, DC 20005
(202) 507-7500

*Attorneys for Plaintiffs*

Dated:  September 19, 2017