# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL VENTURE CAPITAL
ASSOCIATION, *et al.*,

      Plaintiffs,

        v.

ELAINE DUKE, Acting Secretary,
U.S. DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

      Defendants.

Civil Action No. 17-1912 (JEB)

## MEMORANDUM OPINION

Elections have consequences. But when it comes to federal agencies, the Administrative
Procedure Act shapes the contours of those consequences. This case involves the Department of
Homeland Security's decision to delay the implementation of an Obama-era immigration rule,
the International Entrepreneur Rule, 82 Fed. Reg. 5,238 (Jan. 17, 2017). The Rule would have
allowed certain foreign entrepreneurs to obtain immigration "parole" — that is, to temporarily
enter the United States despite lacking a visa or green card. It was finalized in the waning hours
of the Obama administration and was set to take effect 180 days later, on July 17, 2017. On the
eve of that date, however, the Department issued a new rule ("the Delay Rule") delaying the
effective date of the original one for another eight months, until March 14, 2018. The agency did
so, however, without providing notice or soliciting comment from the public, as the APA
generally requires. Plaintiffs brought suit, alleging that the agency lacked good cause to dispense
with the APA's strictures and that the Delay Rule was therefore invalid. Having now reviewed
both sides' Motions for Summary Judgment, the Court agrees and will vacate the Delay Rule.

## I.    Background

The controversy boils down to two competing rules.  The first would have allowed certain foreign entrepreneurs to temporarily enter the United States.  The second, promulgated six months later, delayed that rule from taking effect.  The Court discusses each in turn and then briefly recounts this suit's procedural history.

### A.    The International Entrepreneur Rule

The Department of Homeland Security promulgated the International Entrepreneur Rule ("IE Final Rule") to "encourage international entrepreneurs to create and develop start-up entities with high growth potential in the United States."  82 Fed. Reg. at 5238.  The Department believed that attracting foreign entrepreneurs would "benefit the U.S. economy through increased business activity, innovation, and dynamism."  International Entrepreneur Rule, 81 Fed. Reg. 60,129, 60,131 (Aug. 31, 2016) (Notice of Proposed Rulemaking).  Before the issuance of the regulation, foreign entrepreneurs lacked a clear-cut avenue for entry into this country.  Id. at 60,151-52 & n.52 (citing Nina Roberts, For Foreign Tech Entrepreneurs, Getting a Visa to Work in the U.S. is a Struggle, The Guardian (Sept. 14, 2014)).  The United States had no dedicated visa category for foreign entrepreneurs, and other visa options were frequently unavailable to that group.  Id.

The executive branch, however, cannot unilaterally create a new visa category, see 8 U.S.C. § 1101(a)(15), so it turned to a more temporary solution for immigrant entrepreneurs: parole.  See 82 Fed. Reg. at 5,244.  "Parole" — the French source of which term derives from giving one's word — allows a foreign national to be physically present in the United States for a specific, temporary period, ranging from days to years.  See, e.g., Leng May Ma v. Barber, 357 U.S. 185, 190 (1958).  Unlike visas, parole is not an admission to the United States and gives a

recipient no formal immigration status.  <u>See</u> 8 U.S.C. §§ 1101(a)(13)(B), 1182(d)(5)(A).  The Immigration and Nationality Act (INA) instead grants the Secretary of Homeland Security the discretionary authority to parole individuals into the United States on a case-by-case basis.  <u>Id.</u> § 1182(d)(5)(A).  DHS views that power as "expansive."  82 Fed. Reg. at 5243.  Although it may grant parole only for urgent humanitarian reasons or in cases of "significant public benefit," Congress has defined neither term.  <u>Id.</u> at 5,242-43; <u>see also</u> 8 U.S.C. § 1182(d)(5)(A).

In promulgating the IE Final Rule, DHS latched onto the latter criterion.  It sought to provide guidance for its line-level adjudicators as to when parole for foreign entrepreneurs would provide a "significant public benefit" to the country.  <u>See</u> 82 Fed. Reg. at 5,239.  As the agency explained, adjudicating applications for that group often proved complex, so it "decided to establish by regulation the criteria for the case-by-case evaluation" of their applications.  <u>Id.</u> at 5,238.  The agency also established "application requirements that are specifically tailored to capture the necessary information for processing parole requests on this basis."  <u>Id.</u>  In so doing, DHS expected "to facilitate the use of parole" for foreign entrepreneurs and provide a "transparent framework" by which it would exercise its discretion.  <u>Id.</u>

To be "considered for a discretionary grant of parole" under the Rule, an entrepreneur "would generally need to demonstrate the following":

1.  The applicant must have formed a new start-up entity in the United States within 5 years of the application;

2.  The applicant must a) possess at least a 10% ownership interest in the business; and b) "have an active and central role" in its operations and future growth; and

3.  The applicant must validate the business's potential "for rapid growth and job creation" by showing a) it has received at least $250,000 from established U.S. investors; or b) it has received at least $100,000 in grants from government entities.

Id. at 5,239.  The Rule also created "alternative criteria" for meeting the final prong.  Id.  If an

alien partially met one of the investment thresholds, she could provide "additional reliable and

compelling evidence" of her company's potential for rapid growth and job creation.  Id.

Applicants who met the criteria (along with spouses and minor children) could be

considered for discretionary parole of up to 30 months.  Id.  Those individuals could also apply

for re-parole for up to 30 additional months if they met certain conditions.  Id. at 5,240.

Importantly, however, satisfying the above criteria did not guarantee parole.  Rather, the IE Final

Rule streamlined the agency's treatment of entrepreneurs and guided how it would interpret the

"significant public benefit" prong of the test.  Agents would still need to assess applications on a

case-by-case basis and retained the ultimate discretion as to whether to approve parole.  Id. at

5,239.  In making such discretionary determinations, USCIS would consider all relevant

information, including any criminal history or other serious adverse factors that could weigh

against admission.  Id.  DHS, moreover, retained its authority to terminate parole at any time,

consistent with existing regulations.  Id. at 5,243.  In such cases, the individual would be

"restored to the status that he or she had at the time of parole."  Id. (quoting 8 C.F.R. § 212.5(e));

see also 8 U.S.C. § 1182(d)(5)(A).

The agency solicited and received 763 comments on its proposed rule.  See 82 Fed. Reg.

at 5,244.  In response, it meaningfully revised the final version, including changing the minimum

investment amount, the definition of an entrepreneur, and the definition of a start-up entity.  Id.

at 5,244-5,273.  This final rule was set to take effect July 17, 2017, 180 days from its publication

in the Federal Register.  Id. at 5,242.  DHS determined that this 180-day period would give

USCIS "a reasonable period to ensure resources are in place to process and adjudicate

Applications for Entrepreneur Parole filed . . . under this rule without sacrificing the quality of customer service for all USCIS stakeholders." <u>Id.</u>

B.    <u>The Delay Rule</u>

Of course, times change and so do administrations. On January 25, 2017, President Trump issued an Executive Order targeting current immigration practice. <u>See</u> Border Security and Immigration Enforcement Improvements, Exec. Order No. 13,767, 82 Fed. Reg. 8,793 (Jan. 25, 2017). As relevant here, the Order announced that it "is the policy of the executive branch to end the abuse of parole" of aliens in the United States. <u>Id.</u> at 8,795. Section 11(d) of the Order required the Secretary of Homeland Security to "take appropriate action to ensure that parole authority under section 212(d)(5) of the INA (8 U.S.C. § 1182(d)(5)) is exercised only on a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole." <u>Id.</u> at 8,796.

For the next six months, the Department stayed silent. Six days before the IE Final Rule would take effect, however, USCIS issued a superseding "Delay Rule." 82 Fed. Reg. 31,887 (July 11, 2017). This latter Rule postponed the International Entrepreneur Rule's effective date by eight months, to March 14, 2018. <u>Id.</u> at 31,887. DHS issued the Delay Rule, however, without offering the public advance notice or an opportunity to comment, claiming that there was good cause to jettison the APA's requirements on that score. <u>Id.</u> at 31,887-88. Instead, it provided a short window for comments only <u>after</u> the Delay Rule took effect. <u>Id.</u> at 31,887. DHS further indicated that, pursuant to the Executive Order, the agency was "highly likely" to rescind the IE Final Rule. <u>Id.</u> at 31,888. Its new Delay Rule was designed to bridge the gap,

such that the Obama-era Rule would never take effect.  Id. (seeking "to delay the IE Final Rule while DHS considers rescinding the rule").

      C.      <u>Procedural Background</u>

Plaintiffs include two foreign nationals (Atma and Anand Krishna), two U.S. businesses (Omni Labs, Inc. and Peak Labs L.L.C., d/b/a Occasion), and the National Venture Capital Association, which is an organization of individuals who "frequently invest in businesses founded by foreign entrepreneurs."  Pl. MSJ at 4.  All claim that the Delay Rule has seriously injured their businesses or investments.  Id.

Two months after its issuance, Plaintiffs brought this suit challenging it as invalid, <u>see</u> Compl., ¶ 11, and moved for a preliminary injunction ten days later.  <u>See</u> ECF No. 12.  The Court held oral argument on the motion on October 20, 2017.  In a conference call shortly thereafter, the parties agreed that there were no factual disputes for the Court to resolve, such that the case could be decided expeditiously on summary judgment.  <u>See</u> Minute Order of October 25, 2017.  Plaintiffs thus agreed to hold their motion for a preliminary injunction in abeyance in exchange for the Government's submitting its summary-judgment briefing on an expedited basis. Id.  The Court now considers the parties' Cross-Motions for Summary Judgment.

## II.    **Legal Standard**

The parties have cross-moved for summary judgment on the administrative record.  The summary-judgment standard set forth in Federal Rule of Civil Procedure 56(c), therefore, "does not apply because of the limited role of a court in reviewing the administrative record."  <u>Sierra Club v. Mainella</u>, 459 F. Supp. 2d 76, 89 (D.D.C. 2006); <u>see also</u> <u>Bloch v. Powell</u>, 227 F. Supp. 2d 25, 30 (D.D.C. 2002), <u>aff'd</u>, 348 F.3d 1060 (D.C. Cir. 2003).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record

permitted the agency to make the decision it did." Sierra Club, 459 F. Supp. 2d at 90 (quotation marks and citation omitted). "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the [Administrative Procedure Act] standard of review." Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citation omitted), aff'd, 408 Fed. App'x 383 (D.C. Cir. 2010).

The Administrative Procedure Act "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009). It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While the typical case proceeds as an "arbitrary and capricious" inquiry into agency action, 5 U.S.C. § 706(2)(A), the Court need not articulate that standard here, as Plaintiffs have not raised any challenge to the Delay Rule under that provision of the APA.

## III.   Analysis

Plaintiffs allege that the Delay Rule is invalid, as the agency promulgated it without adhering to the APA's notice-and-comment playbook. See 5 U.S.C. § 533. Before reaching that dispute, however, the Court must first consider whether any Plaintiffs even have standing to press forward.

### A.    Standing

Article III of the Constitution limits the jurisdiction of federal courts to actual "Cases" and "Controversies." U.S. Const., art. III, § 2. But not just any dispute will do. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 559-61 (1992). A plaintiff must demonstrate that she suffers: 1)

an injury-in-fact that is 2) caused by the conduct complained of and 3) "likely" to be "redressed by a favorable decision." Id. at 560-61 (quotations omitted). In a suit brought by multiple parties, only a single plaintiff must possess standing for a case to proceed. See, e.g., Animal Legal Def. Fund, Inc. v. Glickman, 154 F.3d 426, 429 (D.C. Cir. 1998). At oral argument, Plaintiffs submitted that two siblings, Atma and Anand Krishna, present their best bet on that count. See Transcript at 8:3-4. Agreeing, the Court begins and ends its standing analysis there.

The Krishnas are two foreign entrepreneurs who claim that they would have applied and qualified for parole under the International Entrepreneur Rule. See PI Mot., Declaration of Atma Krishna, ¶¶ 7, 9. In May 2017, the two British nationals founded LotusPay, a U.S.-based start-up designed to help companies collect digital payments. Id., ¶¶ 1-2, 5. Both play integral roles in the business — Atma is the CEO, while Anand is the Head of Marketing — and each owns more than a 10% stake in the company. Id., ¶¶ 2, 9. They also allege (and the Government does not dispute) that they could demonstrate a "potential for rapid growth," as their business has already received $120,000 from qualified U.S. investors and was recognized by the renowned start-up incubator Y Combinator. Id., ¶¶ 3-4. The Krishnas contend that the Delay Rule has injured them insofar as they have "lost the opportunity to apply for parole under the [IE Final] Rule." Without parole, they say, they will be unable "to remain in the United States on a long-term basis." Id., ¶ 10. Plaintiffs then attribute a litany of adverse consequences to that lost opportunity — namely, that they will struggle to hire U.S.-based employees, obtain additional investment from U.S.-based investors, and launch their platform in the United States. Id.

For their part, Defendants argue first that "aliens outside the United States generally lack standing to challenge the Government's immigration decisions." Def. Opp. at 14. Their cited cases, however, relate either to justiciability (rather than standing) hurdles or decisions on

individual immigration petitions or visas.  See Def. Opp. at 14-17 (citing Harisiades v. Shaughnessy, 342 U.S. 580, 589-590 (1952) (noting that foreign policy is "largely immune" from judicial interference, but nonetheless resolving foreign alien's constitutional objections to policy); Bruno v. Albright, 197 F.3d 1153, 1159 (D.C. Cir. 1999) (holding denial or revocation of a visa is not subject to judicial review); Kiyemba v. Obama, 555 F.3d 1022, 1026-28 (D.C. Cir. 2009), vacated, 559 U.S. 131 (2010) (habeas corpus petition)).  Plaintiffs, by contrast, do not challenge any specific parole determination.  Instead, they attack the Delay Rule itself, which they allege strips them of any meaningful opportunity to pursue parole.  See Pl. MSJ at 8-9. There is a difference between a challenge to "DHS's exercise of discretion" and one to an "overarching agency policy" as outside the bounds of its statutory authority.  See R.I.L.-R v. Johnson, 80 F. Supp. 3d 164, 176 (D.D.C. 2015).  To the extent Defendants suggest that the result changes when the alien is "outside the United States," Def. Opp at 14, they cite no relevant case law for that proposition.  In any event, one plaintiff — Anand Krishna —resided in this country on a temporary B-1 business visa when he filed suit.  See Krishna Aff., ¶ 6.

Defendants relatedly maintain that "parole is an immigration action granted at the sole discretion of DHS, and aliens have no legally protected interest in a discretionary immigration determination."  Opp. at 20.  They believe that Plaintiffs' inability to apply for parole thus cannot constitute an injury in fact.  Id. at 20-21.  Defendants also question whether Plaintiffs can establish redressability, as "even with the benefit of the IE Final Rule, Plaintiffs still need . . . a favorable exercise of DHS discretion," as well as a favorable inspection at a U.S. port of entry, to receive parole.  Id. at 18.

The Government, however, once again fails to engage with Plaintiffs' actual asserted injury: the lost opportunity to obtain parole status.  While Plaintiffs concede that they have no

right to <u>receive</u> parole, they still maintain that being denied the opportunity to seek it constitutes a cognizable injury. The D.C. Circuit has indeed held that "a plaintiff suffers a constitutionally cognizable injury by the loss of an opportunity to pursue a benefit . . . even though the plaintiff may not be able to show that it was certain to receive that benefit had it been accorded the lost opportunity." <u>CC Distributors, Inc. v. United States</u>, 883 F.2d 146, 150 (D.C. Cir. 1989). In <u>CC Distributors</u>, for example, the Court of Appeals considered whether two private firms had standing to sue the Department of Defense for "the loss of a statutorily conferred opportunity to compete for a contract." <u>Id.</u> The court answered in the affirmative, even though the firms had "no right" to receive the coveted contracts, which the agencies awarded at their discretion. <u>Id.</u> "[G]iven [their] demonstrated capacity to compete for and to obtain such contracts in the past," the court reasoned, an opportunity to compete now "would not be illusory." <u>Id.</u> at 151. The same logic extends to applicants seeking other discretionary benefits. <u>See, e.g.</u>, <u>Regents of the Univ. of Calif. v. Bakke</u>, 438 U.S. 265 (1978) (holding student had standing to challenge affirmative-action policies even though university would still have had discretion to reject him); <u>West Virginia Ass'n of Cmty. Health Ctrs., Inc. v. Heckler</u>, 734 F.2d 1570 (D.C. Cir. 1984) (finding standing where plaintiffs alleged injury from lost "opportunity to compete" for funding from state, even though state "would have complete discretion" to award funding to another party).

Although the D.C. Circuit has not considered whether a "lost opportunity" qualifies as a cognizable injury in the immigration context, other courts of appeals have unanimously concluded that it does. Take, for instance, a plaintiff's standing to challenge the denial of an immigration petition. "[A]pproval of a visa petition vests no rights in the beneficiary" of that petition, <u>see</u> <u>In re Ho</u>, 19 I. & N. Dec. 582, 589 (BIA 1988); <u>De Figueroa v. INS</u>, 501 F.2d 191,

192-93 (7th Cir. 1974), and the petitioner's ultimate relief, a green card, depends on the wholly discretionary approval of the State Department. The Sixth Circuit has nevertheless held that the applicant "los[es] a significant opportunity to receive an immigrant visa" when USCIS denies an immigration petition. Patel v. USCIS, 732 F.3d 633, 638 (6th Cir. 2013) (quoting Abboud v. INS, 140 F.3d 843, 847 (9th Cir. 1998)). "That lost opportunity is itself a concrete injury, and a favorable decision would redress it." Id. The Second, Third, Seventh, Ninth, and Eleventh Circuits have all held the same. See Mantena v. Johnson, 809 F.3d 721, 731 (2d Cir. 2015); Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec., 783 F.3d 156 (3d Cir. 2015); Musunuru v. Lynch, 831 F.3d 880 (7th Cir. 2016); Abboud, 140 F.3d at 847; Kurapati v. USCIS, 775 F.3d 1255, 1260 (11th Cir. 2014).

In those cases, as here, there was no guarantee that the petitioners would successfully obtain admission into the country. Although USCIS has the authority to approve immigration petitions, the State Department retains the final authority to issue visas, and it does so with total — and unreviewable — discretion. See Bruno, 198 F.3d at 1159. But as courts could only "prognosticat[e]" about what the State Department might do, it made sense to assess the likelihood of "relief at a given step, rather than the likelihood of achieving the ultimate goal." Shalom, 783 F.3d at 162-63. At step one, ordering USCIS to approve the petition would give the plaintiff a "significant opportunity to receive an immigration visa." Patel, 732 F.3d at 638.

In this case, too, DHS may ultimately deny parole, which this Court could not review, and it can only "prognosticat[e]" about how the agency would treat the Krishnas' applications. See Shalom, 783 F.3d at 162-63. As it now stands, however, they claim that they have lost even the opportunity to obtain that immigration benefit. Given that they meet the criteria outlined in the Final Rule, such an opportunity would be far from "illusory." Cf. CC Distributors, 883 F.2d

at 151. Rather, with the IE Final Rule in place, the Krishnas would have a "significant opportunity" to move forward with their application. See Patel, 732 F.3d at 638. The Court, consequently, agrees that the loss of that opportunity suffices to establish a cognizable injury.

Plaintiffs are not home yet, however, as there are two wrinkles still to be ironed out. First, the Government has not permanently deprived them of the opportunity to seek parole — at least not so far. As its name implies, the Delay Rule only delays their ability to seek parole. By contrast, when USCIS denies an immigration petition, it derails the application permanently. Even so, the difference gives the Court little pause in this case. The D.C. Circuit has suggested that an "order delaying the rule's effective date . . . [is] tantamount to amending or revoking a rule." Clear Air Council v. Pruitt, 862 F.3d 1, 6 (D.C. Cir. 2017). That is especially so here, as DHS states it is "highly likely" to revoke the Rule. See 82 Fed. Reg. at 31,888. By using this Delay Rule to bridge the gap to rescission, the agency has effectively erased — rather than delayed — the benefit of the IE Final Rule.

Second, even were rescission to occur, Plaintiffs might still technically have an opportunity to apply for parole. As outlined above, the agency has long held the authority to issue parole "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). It retains that authority today. The IE Final Rule simply provides guidance as to how DHS should assess whether a foreign entrepreneur satisfies the "significant public interest" prong of the parole test. Even without that Rule, any given agent could theoretically exercise her discretion to find in Plaintiffs' favor on the same count.

That said, the parties agree that, in practice, the Delay Rule would leave parole a lost cause for entrepreneurs. The Government has maintained in its briefing that the IE Final Rule represented a "tectonic shift" for foreign entrepreneurs. See Def. Opp. to PI at 25. Indeed, that

was the point of the Rule.  See 82 Fed. Reg. at 5,238.  During oral argument, moreover, when Plaintiffs argued that parole would be "virtually impossible" without the Rule, see ECF No. 27 (Oral Arg. Tr.) at 6:20, the Government did not dispute the assertion.  Indeed, it doubled down, agreeing that "parole historically has not been . . . us[ed] in this matter."  Id. at 12:13-16.  This Court, too, is aware of no case in which a foreign entrepreneur has received parole.  It therefore agrees that the Delay Rule deprives Plaintiffs of a "significant opportunity" to pursue parole, see Patel, 732 F.3d at 638, and that loss of a meaningful opportunity constitutes a cognizable injury.

With Plaintiffs' injury properly framed as the "lost opportunity" to seek parole, the redressability inquiry becomes far less thorny.  Plaintiffs ask the Court to invalidate the Delay Rule; were it to do so, the Government agrees that the IE Final Rule would immediately take effect, thereby restoring the Krishnas' shot at parole.  See Def. Opp. at 34.  During oral argument, the Government suggested that even with the IE Final Rule in place, it might still fail to complete any parole requests before rescission.  See Tr. 15:6-23; 16:3-10.  The Court, however, sees no evidence that the agency would simply run out the clock on applications.  Rather, the entire premise of the Delay Rule is that DHS would otherwise implement the IE Final Rule (and expend significant resources doing so).  With no indication of bad faith on the Government's part, the Court assumes it would process applications in regular order.  Were it to do so, Plaintiffs would have a far more meaningful chance at parole than they would have with the Delay Rule in place.  That suffices to establish standing.

B.     Notice and Comment

Having cleared the jurisdictional brush, the Court now turns to the merits.  Under the APA, an agency must provide "[g]eneral notice of proposed rule making" in the Federal Register, as well as "an opportunity to participate in the rule making through submission of

written data, views, or arguments," before promulgating a rule.  See 5 U.S.C. § 553.  These

requirements apply with no less force when the agency seeks to delay or repeal a valid final rule.

As the D.C. Circuit recently reiterated, "'[A]n agency issuing a legislative rule is itself bound by

the rule until that rule is amended or revoked.'"  Clean Air Council v. Pruitt, 862 F.3d 1, 9 (D.C.

Cir. 2017) (quoting Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan, 979 F.2d

227, 234 (D.C. Cir. 1992)) (alterations omitted).  It "may not alter such a rule without notice and

comment," nor does it have any inherent power to stay a final rule.  Id. (internal quotation marks

and alterations omitted).

Defendants, as a result, do not dispute that the Delay Rule constitutes a final rule, subject

to the APA's notice-and-comment requirements.  Nor do they claim compliance with that

provision.  Rather, they seek a haven in the APA's "good cause" exception, which allows an

agency to dispense with notice and comment when it "for good cause finds . . . that notice and

public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  5

U.S.C. § 553(b)(B).  The Court reviews an agency's finding of good cause de novo, Sorenson v.

FCC, 755 F.3d 702, 706 (D.C. Cir. 2014), and, in doing so, must "examine closely" the agency's

explanation as outlined in the rule.  See Council of S. Mountains, Inc. v. Donovan, 653 F.2d 573,

580 (D.C. Cir. 1981).  Because notice and comment is the default, "the onus is on the [agency] to

establish that notice and comment" should not be given.  Action on Smoking & Health v. Civil

Aeronautics Bd., 713 F.2d 795, 801 n.6 (D.C. Cir. 1983).

Any agency faces an uphill battle to meet that burden.  The D.C. Circuit has repeatedly

warned that "the good cause exception 'is to be narrowly construed and only reluctantly

countenanced.'"  Mack Trucks, Inc. v. EPA, 682 F.3d 87, 93 (D.C. Cir. 2012) (quoting Util.

Solid Waste Activities Grp. v. EPA, 236 F.3d 749, 754 (D.C. Cir. 2001)).  The APA "excuses

notice and comment in emergency situations, or where delay could result in serious harm." Jifry v. FAA, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (citations omitted). When, as here, the agency argues that its actions are in the "public interest," the Court will agree only "in the rare circumstance when ordinary procedures — generally presumed to serve the public interest — would in fact harm that interest." Mack Trucks, Inc., 682 F.3d at 95.

### 1.    Delay

Before the Court even reaches the Government's justifications, Plaintiffs argue that the agency has forfeited any "good cause" defense through its own delay. In other words, Defendants purportedly promulgated the Delay Rule in response to an Executive Order issued on January 25, 2017. See 82 Fed. Reg. at 31,887. But they waited until July 11, 2017, to do so — a mere six days before the IE Final Rule was set to take effect. Because Defendants could have initiated the notice-and-comment process during that six-month span, Plaintiffs contend that they may not now rely on "good cause."

That position finds significant traction. It is well established that good cause "cannot arise as a result of the agency's own delay." Washington All. of Tech. Workers v. U.S. Dep't of Homeland Sec., 202 F. Supp. 3d 20, 26 (D.D.C. 2016), aff'd, 857 F.3d 907 (D.C. Cir. 2017). "Otherwise, an agency unwilling to provide notice or an opportunity to comment could simply wait until the eve of a statutory, judicial, or administrative deadline, then raise up the 'good cause' banner and promulgate rules without following APA procedures." Council of S. Mountains, 653 F.2d at 581.

The D.C. Circuit's decision in Environmental Defense Fund, Inc. v. EPA, 716 F.2d 915 (D.C. Cir. 1983), is instructive. There, the EPA "invoke[d] the good cause exception [because of] an alleged pressing need to avoid industry compliance with regulations that were to be

eliminated." Id. at 920. Yet, the agency suspended the requirements just one week before the

reporting deadline, even though the "EPA had expressed its intention to suspend or eliminate the

requirement" eight months earlier. Id. at 920-21. The D.C. Circuit found the delay fatal to its

invocation of good cause: "EPA ha[d] failed to demonstrate that outside time pressures forced

the agency to dispense with APA notice and comment procedures," since any urgency was the

result of the "agency's own delay." Id. at 921. "Therefore, it was not at all reasonable for EPA

to rely on the good cause exception." Id.

The D.C. Circuit (and district courts within this circuit) have repeatedly rejected good

cause when the agency delays implementing its decision. See, e.g., Air Transp. Ass'n of Am. v.

Dep't of Transp., 900 F.2d 369, 379 (D.C. Cir. 1990) (finding agency foreclosed from relying on

good-cause exception after waiting nine months to implement its authority, apparently to focus

on other priorities), vacated as moot, 933 F.2d 1043 (D.C. Cir. 1991); Nat'l Ass'n of

Farmworkers Orgs. v. Marshall, 628 F.2d 604, 622 (D.C. Cir. 1980) (rejecting agency's good-

cause finding where it waited seven months between its initial rule and update to that rule

because "the time pressure . . . was due in large part to the Secretary's own delays"); World Duty

Free Americas, Inc. v. Summers, 94 F. Supp. 2d 61, 65 (D.D.C. 2000) (agency's "considerable

delay [of two years] in promulgating the Rules substantially undercuts defendants' present

position").

To date, Defendants' justification for their delay remains vague. The Government's

briefing never explains the time lag, and, when pressed at oral argument, it struggled to explain

what the agency did between learning of the Executive Order and issuing the Delay Rule. At

most, the agency suggested that it needed time to consider "the applicability of the executive

order" in the "context of a leadership change." Tr. 37:18-20. Apparently, DHS needed until July

to decide whether it was "highly likely" to rescind the IE Final Rule, and only then did it see the Delay Rule as necessary. While the agency may well be decrying an emergency of its own creation, the Court need not resolve whether it has forfeited any good-cause defense. Even on its own terms, the agency's proffered reasons for bypassing notice and comment easily fall short of good cause. The Court now explains why.

*2. Good-Cause Rationales*

In a total of three paragraphs in the Federal Register, DHS offered its rationales for invoking the good-cause exception. First and foremost, the agency explained that if it did not "delay the effective date immediately, USCIS would be required to expend limited agency resources to implement the IE Final Rule." 82 Fed. Reg. at 31,888. Second, it averred that implementing the Rule would "sow confusion" among stakeholders and potentially trigger unwarranted reliance interests. Id. The Court finds neither statement persuasive.

a. Expense

DHS primarily justified the Delay Rule by citing the expense of implementing the new parole system. It worried that doing so "would require USCIS to establish a new business line for the processing of entrepreneur parole applications, hir[e] and train[] additional adjudicators, modify[] intake and case management information technology systems, modify[] application and fee intake contracts, develop[] guidance for the adjudicators, and communicat[e] with the public." 82 Fed. Reg. at 31,888. At the same time, it announced that the Department was "highly likely" to rescind the Final Rule, "and may ultimately eliminate the program, [such that] the expenditure of these resources is unlikely to ever be recouped from filing fees under the new

program." Id. In other words, the agency hesitated to pile resources into a parole program that would not be long for this world.

This explanation does not pass muster. As an initial matter, the agency's concern for its (or its components') own bottom line hardly constitutes the sort of emergency necessary to invoke good cause. As the D.C. Circuit recently explained, "In the past, [it has] approved an agency's decision to bypass notice and comment where delay would imminently threaten life or physical property." Sorenson, 755 F.3d at 706; see, e.g., Jifry, 370 F.3d at 1179 (upholding assertion of good cause when rule was "necessary to prevent a possible imminent hazard to aircraft, persons, and property within the United States" after terrorist attacks on September 11, 2001); Council of the S. Mountains, 653 F.2d at 581 (noting case was one of "life-saving importance" involving miners in mine explosion). It is true that the Court of Appeals has reserved the "possibility that a fiscal calamity could conceivably justify bypassing the notice-and-comment requirement." Sorenson, 755 F.3d at 707. Yet, that fiscal injury was to third parties, not the government. Id. at 705-07 (finding no good cause even though agency's fund, paid out to telecommunication providers, might suffer shortfall absent immediate rule). Defendants cite no case in which a court has found good cause simply because it would save the agency resources.

Even assuming that "fiscal peril" for an agency could constitute good cause, DHS has failed to provide "factual findings supporting the reality of that threat." Id. at 706. In fact, DHS previously stated that it did not anticipate "that the rule will generate additional processing costs to the government to process applications." 82 Fed. Reg. at 5,274. That is because "[t]he INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing services, including administrative costs and services provided without charge to

certain applicants and petitioners." Id. at 5,282.  Specifically, the agency estimated it would process roughly 2,900 applications this year and receive $1,285 each in filing fees, generating more than $3.5 million.  Id. at 5,283.  Spouses and dependents must also pay filing fees totaling about $765 each, and any spouse seeking work authorization would kick in another $410.  Id. at 5,273-74.  At the time, DHS believed those fees sufficient to cover "processing costs to the government."  Id. at 5,274.  The Government offers nothing to undercut that estimate, such as by providing competing figures about how much implementing the Rule would actually cost.  Nor does it explain why ultimate rescission of the Rule would somehow imperil these collections during the Rule's vitality.  Defendants instead rely largely on their "assessment of their own limited resources," Opp. at 31, but an "agency cannot claim good cause without offering any evidence, beyond its asserted expertise."  Tennessee Gas Pipeline Co., 969 F.2d at 1145-46 (rejecting good cause when agency provided "little factual basis" for its views).  Without more, the Government has not shown a "fiscal calamity" in the making.  See Sorenson, 755 F.3d at 705-07.

At times, Defendants also suggest that the Rule was an "extraordinary change" to the parole system and would thus involve "training adjudicators about a novel and extraordinarily complex exercise of parole authority."  Opp. at 29-30.  This logic suffers from several flaws. First, the IE Final Rule would not "up-end . . . over a century" of discretionary decisionmaking, as Defendants protest.  Id. at 32.  Rather, it expressly preserves the agency's discretion on a case-by-case basis, while providing "guidance" on how officers might exercise that discretion in a uniquely "complex" area of parole.  See 82 Fed. Reg. at 5,238.   While the Rule may have changed the game for entrepreneurs, it was a far less significant shift for the agency.  DHS expects it might receive and process 2,940 applications related to the Rule — hardly a change of

"tectonic" proportions.  Id. at 5,273.  Second, the agency went through the proper channels to consider and mitigate the impact of its updated parole process.  It solicited and received more than 700 comments, id. at 5,244, and deemed a six-month time lag sufficient to implement the new system.  Id. at 5,242.  Given that considered process, there is no indication that implementing the Rule would be unduly taxing on the agency.

Finally, although Defendants maintain that rescission of the IE Final Rule is imminent — such that any expenditures to implement it would be wasteful — the Court has seen no effort to that effect thus far.  Almost five months have already passed since issuance of the Delay Rule, and the agency has still not promulgated any notice of proposed rulemaking, much less a final version.  As DHS waits to issue a new rule, its arguments in favor of delay leak water.  The agency purportedly seeks to avoid frittering away resources on a temporary rule but, at least for now, the IE Final Rule seems to have a solid hull.

b.  Confusion and Reliance

Perhaps recognizing the weakness of its primary justification, Defendants assure the Court that the Delay Rule was not "simply a matter of off-setting costs or training" additional agency employees.  See Def. Opp. at 32.  Instead, the agency insists that implementing the IE Final Rule "would sow confusion and would likely cause the waste of resources by multiple stakeholders with interests in [the] rulemaking."  82 Fed. Reg. at 31,888.  But a "desire to provide immediate guidance, without more, does not suffice for good cause."  United States v. Cotton, 760 F. Supp. 2d 116, 128 (D.D.C. 2011) (quoting United States v. Cain, 583 F.3d 408, 421 (3d Cir. 2009)).  To hold otherwise "would swallow the rule," as an agency could always argue that any given regulation provides clarification or guidance.  See United States v. Valverde, 628 F.3d 1159, 1166 (quoting Zhang v. Slattery, 55 F.3d 732, 746 (2d Cir. 1995)); see

also Nat'l Ass'n of Farmworkers Orgs. v. Marshall, 628 F.2d 604, 621 (D.C. Cir. 1980) ("[G]ood cause to suspend notice and comment must be supported by more than a bare need to have regulations.").

Defendants nonetheless pitch the Rule as an "extraordinary change," which would "add regulatory complexity" to the parole system. See Opp. at 29. As explained above, that protestation overstates the novel nature of the Rule. In any event, Defendants fail to show any real "confusion" that required bypassing notice and comment. Most concretely, the agency worries that if the IE Final Rule were left in place, foreign entrepreneurs might misguidedly rely on it, including by "expending significant effort and resources in order to establish eligibility under the criteria promulgated by the IE Final Rule." See 82 Fed. Reg. at 31,888. They could then be caught betwixt and between if rescission subsequently occurred. Similarly, it fears that companies might unwittingly invest in a start-up, only to learn later that its owners had no shot at parole. Those claims ring hollow, however, when a notice of proposed rulemaking would, by definition, alert the public that the agency was considering delaying or rescinding the Rule. Had the agency issued such a notice, entrepreneurs could have made a reasoned decision as to whether to expend effort and resources. The same is true for any companies considering investments. Plaintiffs aver that they, at least, would choose to apply under the IE Final Rule, even understanding any chance at parole might be short-lived. See Krishna Aff., ¶ 11. Start-ups grow rapidly, so Plaintiffs believe that even a short stint in the United States could aid their business; they also hope that the Government might grandfather in applications or reevaluate its stance once it sees the program in operation. See Pl. MSJ at 26-27.

The agency, moreover, gave little thought to those foreign entrepreneurs who may have already relied on the impending IE Final Rule, set to take effect just six days before the agency

suspended it. Without notice to the contrary, aliens would have fairly expected the Rule to take place as scheduled and therefore already "expend[ed] significant effort and resources in order to establish eligibility." The Delay Rule prejudices any reliance interest they had in the IE Final Rule.

In the Federal Register, the Government cited two cases to support its argument that regulatory "confusion" arising from the IE Final Rule constituted good cause: Am. Hosp. Ass'n v. Bowen, 834 F.2d 1037, 1045 (D.C. Cir. 1987), and Mid-Tex Elec. Coop. v. FERC, 822 F.2d 1123, 1133-34 (D.C. Cir. 1987). Neither provides guidance here. Bowen involved exceptions "for interpretive rules, procedural rules, or general statements of policy," which are not subject to the same APA requirements as final rules. See 834 F.2d at 1044-45. Here, by contrast, Defendants concede that the Delay Rule is subject to the APA's strictures. In Mid-Tex, the D.C. Circuit considered whether FERC could adopt an interim rule after the court struck down its first attempt. Id. at 1124-25. Although the panel recognized the question was "substantial and troublesome," it allowed FERC to fill the void rather than leave the agency without any rule or guidance in place. Id. at 1132. There is no such risk in this case. But for the Delay Rule, the IE Final Rule would take effect and provide guidance for any entrepreneurs considering a parole application.

* * *

All told, "[a]gencies obviously have broad discretion to reconsider a regulation at any time," and the Department may well ultimately decide to rescind the International Entrepreneur Rule. See Clean Air Council, 862 F.3d at 8. To do so, however, it "must comply with the Administrative Procedure Act (APA), including its requirements for notice and comment." Id. In this case, each of the agency's explanations might be good reason to promulgate the Delay

Rule, but none justifies finalizing it without notice and comment. The Rule is therefore procedurally defective.

C. Remedy

That leaves the question of remedy. When a court concludes that agency action is unlawful, "the practice of the court is ordinarily to vacate the rule." Ill.Pub. Telecomms. Ass'n v. FCC, 123 F.3d 693, 693 (D.C. Cir. 1997); Reed v. Salazar, 744 F. Supp. 2d 98, 119 (D.D.C. 2010) ("[T]he default remedy is to set aside Defendants' action."); Sierra Club v. Van Antwerp, 719 F. Supp. 2d 77, 78 (D.D.C. 2010) ("[B]oth the Supreme Court and the D.C. Circuit Court have held that remand, along with vacatur, is the presumptively appropriate remedy for a violation of the APA."). "[A]lthough vacatur is the normal remedy, [courts] sometimes decline to vacate an agency's action." Allina Health Servs. v. Sebelius, 746 F.3d 1102, 1110 (D.C. Cir. 2014). That decision depends on the "seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change." Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150-51 (D.C. Cir. 1993); see also Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers, 2017 WL 4564714, at *8 (D.D.C. Oct. 11, 2017) (declining to vacate when agency "largely complied" with statute and could likely substantiate prior conclusions on remand).

Neither factor favors the Government here. The D.C. Circuit recently made clear that "deficient notice is a 'fundamental flaw' that almost always requires a vacatur." Allina Health, 746 F.3d at 1110 (quoting Heartland Reg'l Med. Ctr. v. Sebelius, 566 F.3d 193, 199 (D.C. Cir. 2009)). It comes as no surprise, then, that "[w]hen notice-and-comment is absent, the Circuit has regularly opted for vacatur." In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig., 853 F. Supp. 2d 138, 144 (D.D.C. 2012); see also CropLife America v. EPA, 329 F.3d 876, 879

(D.C. Cir. 2003) (vacating regulation issued without notice and comment); <u>Mendoza v. Perez</u>, 72 F. Supp. 3d 168, 175 (D.D.C. 2014) (vacating rule when agency failed to "engage in notice and comment," as error was "a fundamental procedural" one); <u>AFL-CIO v. Chao</u>, 496 F. Supp. 2d 76, 91 (D.D.C. 2007) (noting that "failure to comply with the APA's notice-and-comment requirements is unquestionably a 'serious' deficiency").

Nor would vacatur be particularly disruptive. This is not a case in which "the egg has been scrambled and there is no apparent way to restore the status quo ante." <u>Sugar Cane Growers Co-op of Fla. v. Veneman</u>, 289 F.3d 89, 97 (D.C. Cir. 2002). Rather, vacating the Delay Rule would simply allow the IE Final Rule to take effect, as the agency originally intended. When the Department first issued that Rule in January, it anticipated needing six months' lag time to implement it. Now, nearly ten months have elapsed.

Defendants do not question whether vacatur would be appropriate; instead, they suggest that the Court should stay any such order. In so arguing, DHS largely reprises its reasons for dispensing with notice-and-comment in the first place. To wit, they claim that a stay is necessary to save expenses and avoid reliance interests as the agency fashions a new Rule. As explained above, none of those consequences justified dispensing with notice-and-comment, and none justifies a stay. <u>See</u> <u>Hudson v. Am. Fed. of Gov't Employees</u>, 2017 WL 5564119, at *2-3 (D.D.C. Nov. 15, 2017) (noting district court has discretion to balance equities in staying relief). To so order would simply remedy the agency's delay with more delay. Defendants also invite this Court to commission additional briefing as to remedy. Both parties, however, have had a full opportunity to address the subject and have done so in detail. If Defendants have additional reasons why a stay might be appropriate pending any appeal, they can so move. Until then, the Court believes that vacatur is the appropriate remedy.

## IV.    Conclusion

For the foregoing reasons, the Court will grant Plaintiffs' Motion for Summary Judgment and deny Defendants'.  It will also vacate the Delay Rule.  A contemporaneous Order to that effect will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: December 1, 2017